UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
KADIAN NOBLE,

                    Plaintiff,

      -against-

HARVEY WEINSTEIN, ROBERT WEINSTEIN, THE
WEINSTEIN COMPANY LLC, and WEINSTEIN
COMPANY HOLDINGS, LLC,

                    Defendants
------------------------------------------X

17 Civ. 9260 (RWS)

OPINION

A P P E A R A N C E S:

      Attorneys for Plaintiff

      Herman & Mermelstein, P.A.
      18205 Biscayne Blvd., Suite 2218
      Miami, FL 33160
      By:  Stuart Samuel Mermelstein

      Attorneys for Defendants

      Kupferstein Manuel LLP
      865 South Figueroa Street, Suite 3338
      Los Angeles, CA 90017
      By:  Mary E. Flynn
           Phyllis Kupferstein

      Morrison Cohen, LLP(NY)
      909 Third Avenue
      New York, NY 10022
      By:  Aaron Michael Schue
           Latisha Vernon Thompson

      Schulte Roth & Zabel LLP (NY)
      919 Third Avenue
      New York, NY 10022
      By:  Carly Jeanine Halpin
           Gary Stein
           Brian Theodore Kohn
           Barry A. Bohrer
           Abigail Flynn Coster

**Sweet, D.J.**

Defendants Harvey Weinstein ("Harvey") and Robert
Weinstein ("Robert") have moved under Federal Rule of Civil
Procedure 12(b)(6) to dismiss the Amended Complaint of plaintiff
Kadian Noble ("Noble" or "Plaintiff") alleging violations of the
Victims of Trafficking Victims Protection Act ("TVPA"), 18
U.S.C. § 1591 ("Section 1591"), under which a civil private
right of action exists (18 U.S.C. § 1595 ("Section 1595")), to
Harvey's alleged 2014 sexual assault of Plaintiff in Cannes,
France.[1]

The alleged predatory sexual conduct of Harvey
Weinstein has been the subject of extensive publicity,
investigations, and litigation.[2] The instant Amended Complaint is

---

[1]     Because the conduct alleged in this case predates the May
29, 2015 amendment of 18 U.S.C. § 1591, all references to 18
U.S.C. § 1591 refer to the 2014 version, effective from December
23, 2008 to May 28, 2015. Ditullio v. Boehm, 662 F.3d 1091, 1102
(9th Cir. 2011) ("We affirm the district court's conclusion that
§ 1595 cannot be applied retroactively to create liability for
conduct that occurred before [the statute was amended].")
Notably, the May 2015 amendment, which added the statutory verbs
"advertises," "patronizes," and "solicits" to Section
1591(a)(1), does not change the substance of the statute as
applied to Defendants. Compare 18 U.S.C. 1591(a)(effective Dec.
23, 2008), with 18 U.S.C. § 1591(a)(effective May 29, 2015).

[2]     For pending litigation in this District, see, e.g., Federal
Insurance Company et. al. v. Weinstein, No. 18-cv-2526 (S.D.N.Y.
Feb. 28, 2018); Louisette Geiss, et. al. v. Weinstein, No. 17-
cv-9554 (S.D.N.Y. Dec. 06, 2017); Sandeep Rehal v. Weinstein,

1

the first instance seeking to apply the TVPA to an incident such as the one alleged by the Plantiff.

Based on the conclusions set forth below, Defendant Harvey Weinstein's motion is denied, and Defendant Robert Weinstein's motion is granted.

---

No. 18-cv-0674 (S.D.N.Y. Jan. 25, 2018); Steadfast Insurance Co. v. Weinstein, No. 18-cv-6458 (S.D.N.Y. July 17, 2018); Canosa v. Ziff, Weinstein, et. al., No. 18-cv-4115 (S.D.N.Y. May 8, 2018); Jane Doe v. Weinstein, 18-cv-5414 (S.D.N.Y. June 15, 2018); Dulany et. al. v. Miramax, No. 18-cv-4857 (June 1, 2018) (cases pending in this district). For the criminal investigations into Harvey Weinstein's alleged conduct, see, e.g., Al Baker, et. al., Police Building Case to Arrest Harvey Weinstein After Sexual Assault Claim, NEW YORK TIMES, Nov. 3, 2017; James McKinley, Prosecutor of Patz's Killer Takes Over Weinstein Inquiry, NEW YORK TIMES, April 25, 2018; Richard Winton, D.A.'s Hollywood sex crimes unit weighs charges against Harvey Weinstein, Steven Seagal and others, LOS ANGELES TIMES, May 16, 2018; Alan Feuer, Federal Inquiry Into Weinstein Expanded to Include Stalking, NEW YORK TIMES, May 23, 2018; Samantha Cooney, Harvey Weinstein Could Face Even More Charges. Here Are All the Investigations Looking Into Sexual Assault Allegations, TIME, MAY 25, 2018, Press Association, UK police receive fresh Harvey Weinstein sexual assault claim, THE GUARDIAN, Feb. 28, 2018. And for relevant press accounts, see, e.g., Ronan Farrow, Harvey Weinstein's Army of Spies, THE NEW YORKER, Nov. 6, 2017, Abby Ohlheiser, et. al., Harvey Weinstein charged with rape and other abuse violations in sexual assault cases, THE WASHINGTON POST, MAY 25, 2018.

I.   **The Amended Complaint**

The following allegations,[3] which are assumed true for purposes of the instant motion, Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012), detail the actions of Harvey Weinstein in Cannes, France in 2014, which are alleged to violate Section 1591.

In February 2014, Harvey, a film-producer and co-founder of The Weinstein Company, LLC ("TWC" or "Weinstein Company"), approached Plaintiff, an aspiring actress, at a social function in London. Am. Compl. ¶ 15. After expressing professional interest in her as an actress, Harvey represented

---

[3]   The allegations are drawn from the Amended Complaint and the materials attached to and incorporated by reference therein. A complaint initiated by the New York Attorney General's office ("OAG Complaint"), which alleges violations of New York State Human and Civil Rights laws, is attached to the Amended Complaint. Am. Compl. Exh. A, State of New York v. Weinstein, No. 450293, 2018 WL 845422 (Feb. 11, 2018). While the Court is permitted to consider "any written instrument attached to the complaint, [and] statements or documents incorporated into the complaint by reference," such materials are to be evaluated for their legal feasibility according to the relevant causes of action. See, e.g., ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). The OAG Complaint contains certain factual allegations relating to the conduct alleged in the Amended Complaint. Because there are no allegations in the OAG Complaint that relate to Count I against Harvey, it is not considered for resolving Count I. As for Counts III and V against Robert, the OAG Complaint is sufficiently related to those allegations—it is therefore considered for resolving Counts III and V.

that he "wanted to learn more" about Noble. Id. Later that
night, Harvey told Noble that he had a particular acting role in
mind for her, insisting that "it will be good for [her]." Id. at
¶ 16. Harvey then introduced Noble to Charlotte, a TWC executive
to whom Noble gave "detailed contact information." Id. Harvey
repeated to Noble his assurance that the role he had in mind
would "be good for [her]." Id.

Following their initial meeting in London, Harvey
arranged an interview between Noble and Vanessa Ford ("Ford"), a
Weinstein Company Executive Assistant. Id. at ¶ 20. At the
interview, Noble spoke "at great length and detail" about her
background, previous work experience, and aspirations. Id. Ford
instructed Noble to write a "narrative" about herself, and to
provide a film "reel," sampling her acting work, both of which
she did. Am. Compl. ¶ 20. Ford assured Noble that the reel and
the narrative would be sent to Harvey, and that Noble "would be
contacted." Id.

In May 2014, Noble and Harvey were separately in
Cannes, France for the 2014 Cannes Film Festival. Id. at ¶ 26.
According to Plaintiff, Harvey approached her in the lobby at La
Majestic Hotel, at which time Noble asked Harvey whether he had
received her film reel. Id. at ¶ 27. Harvey confirmed that he

had, but told Noble that he had not yet reviewed it. Id. Harvey
then invited Noble to come to his hotel room to view the reel
and to discuss the film role he had in mind for her. Id. at ¶
27. According to Noble, because of Harvey's tremendous influence
in the industry, and the promise of a lucrative film role, she
went to his hotel room. Id. at ¶ 28.

      Once in the hotel room, Harvey and Noble sat on a
couch and watched her film reel. Id. at ¶ 29. As they watched,
Harvey began massaging Noble and "gripped her shoulders." Id. at
¶ 29. He told Noble that he had all of "her details" and that he
would "take care of everything" for her. Am. Compl. ¶ 29. Harvey
told her that a particular male TWC assistant would be "on this
task," and would also arrange a meeting for Noble with the Tess
modeling agency in London. Id. at ¶ 29.

      Harvey told Noble that, for "audition purposes," she
needed to walk up and down through the hotel room for him, which
she did. Id. at ¶ 30. Harvey then called an unnamed Weinstein
Company producer in the United States and put Noble on the phone
with him. Id. at ¶ 31. The producer told Noble that, if she was
"a good girl" and did "whatever [Harvey] wished," then "they
would work [with her]." Id.

Harvey then grabbed the Plaintiff, pulled her towards him, and groped her breasts. Id. at ¶ 32. Harvey told Noble that he "had to have her." Id. Noble resisted, saying "No, Harvey, No!" Id. At the same time, "because of the tangible and intangible benefits Harvey Weinstein promised," Noble physically complied. Id.

Harvey then forcibly pulled Noble into the bathroom, where he began rubbing her breasts and buttocks. Id. at ¶ 33. Noble told Harvey to stop, and tried to leave the bathroom, but Harvey blocked her exit and pulled her shirt down, revealing her breasts. Am. Compl. ¶ 35. Harvey then forced Noble's legs open, rubbed her vagina, and took his penis out and began masturbating. Id. at ¶ 36. Noble struggled and panicked. Id. at ¶ 36. Again, she attempted to leave the bathroom, but Harvey prevented her. Id. Harvey then grabbed Noble's hand, forced her to masturbate him, and used his other hand to control Noble. Id. at ¶ 37. Harvey assured Noble that "everything will be taken care of for you if you relax." Id. Noble understood this to mean that Harvey would follow through on his promise to wield his influence in this industry in her favor if the sex act was completed. Harvey ejaculated on the bathroom floor. Id. at ¶ 38.

Noble then left Harvey's hotel room. Id. at ¶ 39. On
her way out, Harvey told her that "his people" would be in touch
with her. Id. Noble understood this to mean that either Ford or
the male assistant would be in contact regarding the film role
or modeling opportunity. Id.

In the months that followed, Noble maintained contact
with Ford, following up several times. Id. at ¶ 41. She was told
to be patient, that Ford was waiting for instructions from
Harvey. Id. Although Noble saw Harvey three times after the
alleged 2014 sexual assault, no film role materialized. Am.
Compl. ¶ 12. No follow up meetings were scheduled. Id. No
actions were taken by Harvey to further Noble's career as an
actress or as a model. Id.

As a result of Harvey's actions, Noble suffered
emotional pain, mental anguish, shame, humiliation, loss of
enjoyment of life, and other "permanent and continuing"
injuries. Id.

The allegations relating to Robert include that he
knew about, and benefited from, Harvey's international business
dealings in his position as co-founder of TWC. Id. at ¶ 72-77.
Robert "knew, or was in reckless disregard of the fact, that it

7

was the pattern and practice of Harvey Weinstein to travel in interstate and foreign commerce to entice or recruit [] young female actors with the promise of roles." Id. at ¶ 74. Further, Plaintiff alleges he "willfully caused" Harvey's sex acts with Noble by "supporting Harvey Weinstein's pursuit of their joint business interests." Id. at ¶ 85.

The Amended Complaint alleges in Count I a violation of Section 1591 against Harvey Weinstein, in Count II participation in a venture in violation of Section 1591 against The Weinstein Company, in Count III participation in a venture in violation of Section 1591 against Robert, in Count IV an aiding and abetting violation of Section 1591 against The Weinstein Company, and in Count V an aiding and abetting violation against Robert.

## II.  **Prior Proceedings**

Plaintiff filed this federal lawsuit in November 2017, alleging violations of 18 U.S.C. § 1591, under which a private civil right of action is available pursuant to 18 U.S.C. § 1595, against Harvey, Robert, and The Weinstein Company. ECF No. 1. In February of 2018, Plaintiff amended her complaint, adding

supporting facts and attaching the OAG Complaint against Harvey, Robert, and The Weinstein Company as an exhibit. ECF No. 48.

On March 20, 2018, The Weinstein Company Holdings and all of its wholly-owned subsidiaries, including the Weinstein Company, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, Section 11 U.S.C. §§ 101-1532. ECF No. 56. Pursuant to Section 362(a) of the Bankruptcy Code, an automatic litigation stay was entered for all cases involving the Weinstein Company, including this one. Id.

Defendants Harvey and Robert filed motions to dismiss on March 27 and May 15, 2018, respectively. ECF No. 59, 75. Both motions were heard on June 29, 2018, at which time they were marked fully submitted.

## III.   The Applicable Standards

### A. Rule 12(b)(6)

On a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). A complaint

must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible on its face.*'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)) (emphasis added). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." Twombly, 550 U.S. at 557 (internal quotation marks omitted).

While "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" Munoz-Nagel v. Guess, Inc., No. 12 Civ. 1312 (ER), 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)); Prince v. Madison Square Garden, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); Williams v. Calderoni, 11 Civ. 3020 (CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012)). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a

legally cognizable right of action." <u>Twombly</u>, 550 U.S. at 555

(citation and internal quotation omitted).


### B. 18 U.S.C. § 1591


When the United States Congress passed Section 1591 of

the TVPA it did so for the following purposes: "to combat

trafficking in persons, especially into the sex trade, slavery,

and involuntary servitude, to reauthorize certain Federal

programs to prevent violence against women, and for other

purposes." Pub. L. No. 106-386 § 102, 114 Stat. 1488 (2000)

(codified as 18 U.S.C. § 1591). The statute defines "sex

trafficking" in Section 103 as "the recruitment, harboring,

transportation, provision, or obtaining of a person for the

purpose of a commercial sex act." Pub. L. No. 106-386 § 103, 114

Stat. 1488 (2000). Congress defines "commercial sex act" as "any

sex act on account of which anything of value is given to or

received by any person." <u>Id.</u> Congress noted that "trafficking in

persons is not limited to the sex industry," and that

"traffickers lure women and girls into their networks through

false promises of decent working conditions at relatively good

pay as nannies, maids, dancers, factory workers, restaurant

workers, sales clerks, or models." Pub. L. No. 106-386 § 102,

114 Stat. 1488 (2000).

In 2003, Congress amended and expanded the TVPA for the purpose of "enhancing provisions on prevention of trafficking, protections of victims of trafficking, and prosecution of traffickers." H. R. Rep. No. 108-264(I), at 8 (2003), 2004 U.S.C.C.A.N. 2408, 2408. In doing so, Congress added a private right of action which provides:

> An individual who is a victim of a violation of Section 1589, 1590, or 1591 of title 18, United States Code, may bring a civil action in any appropriate district court of the United States. The court may award actual damages, punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred.

Section 1595(a) ("2003 Amendment").

Following the 2003 Amendment, victims of the conduct proscribed in Section 1591 are entitled to seek civil damages as private litigants under Section 1595.

Section 1591, as it existed in 2014, imposed criminal sanctions on "whoever knowingly" "recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person" with the knowledge that "means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means" would be employed to "cause the

12

person to engage in a commercial sex act." 18 U.S.C.A. § 1591(a)
(West).

## IV.  Defendant Harvey Weinstein's Motion to Dismiss Count I is Denied

Plaintiff's Amended Complaint adequately states a
claim under Section 1591 against Harvey Weinstein. While the
instant case is not an archetypal sex trafficking action,[4] the
allegations plausibly establish that Harvey's 2014 conduct in
Cannes, France violated Section 1591.

Plaintiff maintains that Section 1591 applies to
Harvey Weinstein, a powerful businessman who employed both fraud
and physical force to cause the Plaintiff to engage in a sex act
with him. The fraud consists of promises of a lucrative film
role and a modeling meeting, which were knowingly false, and on
which she reasonably relied. 18 U.S.C. § 1591; Am. Compl. at ¶ 1
("Harvey Weinstein . . . recruited and enticed a young aspiring

_____

[4]   See generally United States v. Baston, 818 F.3d 651, 656
(11th Cir. 2016) (affirming conviction of defendant, who
recruited vulnerable women in the United States, Australia, the
United Arab Emirates, enticing one with "promis[es] to help her
modeling career," and another by offering to help her "open[]
her own restaurant," only to "force numerous women to prostitute
for him by beating them, humiliating them, and threatening to
kill them.").

13

actress . . . with the promise of a film role and to use his considerable influence in the entertainment industry on her behalf, knowing that he would use means of force, fraud, or coercion to cause her to engage in a sex act.")

To state a claim under 18 U.S.C. § 1591, as applied here, Plaintiff must adequately plead that Harvey Weinstein knowingly and in interstate or foreign commerce: (1) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) "knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud . . . or any combination of such means will be used"; (3) "to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591.

Harvey contends that Count I of the Amended Complaint against him should be dismissed because "not every alleged sexual assault constitutes a federal violation," and that application of Section 1591 here "would unfairly expand the federal sex trafficking statute to all sexual activity occurring between adults in which one party holds a superior position of power and influence." ECF No. 60 at 5. In particular, Harvey contends that the "commercial sex act" element is absent because nothing of value was exchanged. Id.

14

*i.  Broad interpretation of Sections 1591 and 1595 is appropriate*

The remedial provision at issue, Section 1595, which permits civil actions for damages under Section 1591, requires broad interpretation. See Peyton v. Rowe, 391 U.S. 54, 65 (1968) (recognizing "the canon of construction that remedial statutes should be liberally construed"). Section 1595 amended the TVPA for the remedial purpose of "enhancing . . . protections of trafficking victims." 18 U.S.C. § 1595, Pub. L. 108-193, Dec. 19, 2003, 117 Stat. 2878, §4 (effective Dec. 19, 2003); see also N.C. Freed Co., Inc. v. Bd. of Governors of Fed. Reserve Sys., 473 F.2d 1210, 1214 (2d Cir. 1973) ("Since the statute is remedial in nature, its terms must be construed in liberal fashion[.]"); Sedima, S.P.R.L. v. Imrex Co., Inc. 473 U.S. 479, 499 (1985) (recognizing that while "RICO is evolving into something quite different from the original conception of its enactors," "it is not for the judiciary to eliminate the private actions in situations where Congress has provided it simply because plaintiffs are not taking advantage of it in its more difficult applications.")

Broad, expansive language is employed in Sections 1591 and 1595. See 18 U.S.C. §§ 1591, 1595. Congress's use of the word "whoever" and its repeated use of the word "any" "does not

15

lend itself to restrictive interpretation." United States v. Jungers, 702 F.3d 1066, 1070 (8th Cir. 2013) ("By its terms, § 1591(a)(1) applies to 'whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, or maintains [a child] by any means.' These words do not lend themselves to a restrictive interpretation.") (collecting cases); United States v. Todd, 627 F.3d 329, 336 (9th Cir. 2010) (Smith, M., concurring) ("[Section 1591] allows for a conviction even where the defendant did not personally use force, fraud or coercion," so long as he knew such means would be used.)

Defendant Harvey contends that the application of Section 1591 should be limited to "the type of criminality for which the Government has historically prosecuted under Section 1591, such as child prostitution, torture, and child pornography." ECF No.60 at 10. Setting aside for a moment that this is a civil, rather than criminal, action, other courts have applied Section 1591 to defendants who have lured women, under false pretenses and with lucrative promises, for sexual purposes.[5]

---

[5]    See e.g., Lawson v. Rubin, 2018 WL 2012869, at *15 (E.D.N.Y. Apr. 29, 2018) (plaintiff plausibly alleged a violation of Section 1591 where defendant "lure[d]" women to his New York City apartment—promising, among other things, "payments for modeling"—where he beat and sexually assaulted them); United States v. Thompson, 864 F.3d 837, 840-41 (7th Cir. 2017)

The first step in any statutory interpretation is to determine "whether the language at issue has a plain and unambiguous meaning." Louis Vuitton Maletier S.A. v. LY USA, Inc., 676 F.3d 83, 108 (2d Cir. 2012); see also Mary Jo C. v. New York State & Local Ret. Sys., 707 F.3d 144, 155 (2d Cir. 2013).

Where, as here, a broad statute has a plain and unambiguous meaning, it ought to be interpreted broadly. BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what is says. Thus, our inquiry begins with

---

(affirming conviction of defendant who "used the promise of modeling work to 'cause a person to engage in a commercial sex act.'"); United States v. Flanders, 752 F.3d 1317 (11th Cir. 2014) (affirming conviction of defendant who lured women "under the false pretense of auditioning for a lucrative modeling contract in South Florida," only to beat and rape them); United States v. Mack, 808 F.3d 1074 (6th Cir. 2015) (affirming conviction of defendant who "coerced the victims into prostituting themselves by initially supplying them with drugs under the false pretense that they were free"); United States v. Mozie, 752 F.3d 1271, 1276 (11th Cir. 2014) (affirming conviction of defendant who "pos[ed] as a benevolent businessman who ran a modeling agency" to recruit adults and minors for sex "in return for alcohol, drugs, and a place to stay."); United States v. Rojas-Coyotl, 2014 WL 1908674 (N.D. Ga. May 13, 2014) (applying Section 1591 to defendant, who lured Mexican and Guatemalan women to the US with promises of "legitimate work").

17

the statutory text, and ends there as well if the text is unambiguous.") (internal citation omitted); United States v. Estrada-Tepal, 57 F. Supp. 3d 164, 167 (E.D.N.Y. 2014) ("18 U.S.C. § 1591 unambiguously covers a broad range of conduct with no requirement that a defendant intend to further any underlying sex trafficking scheme."); see also United States v. Thompson, No. 16-2986, 2018 WL 3398213, at *8 (2d Cir. July 13, 2018) (rejecting challenge to Section 1591 on constitutional overbreadth grounds, noting the "broad language of the statute and the complexity of the social problem it addresses").

ii. *Recruited, enticed, or solicited a person*

The operative statutory verb in Section 1591(a), as applicable here, is "entices," which is not defined by Congress. When a word is undefined in a statute "we normally construe it in accord with its ordinary or natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993); United State v. Gagliardi, 506 F.3d 140, 147 (2d Cir. 2007) (recognizing that "induce, entice, [and] coerce, though not defined in the statute, are words of common usage that have plain and ordinary meanings."). The ordinary or natural meaning of "entice" is supplied by the Merriam-Webster and Oxford dictionaries, which define it as "to attract artfully or adroitly or by arousing hope or desire," and

18

"[to] attract or tempt by offering pleasure or advantage,"
respectively. MERRIAM-WEBSTER ONLINE DICTIONARY,
https://www.merriam-webster.com/dictionary/entice; OXFORD
DICTIONARIES,
https://en.oxforddictionaries.com/definition/entice.

Here, it is alleged that Harvey initiated a
professional relationship with Noble in February, 2014, when the
two first met in London. Am. Compl. ¶ 15. After telling Noble
that he had a film role in mind for her, Harvey set up an
"interview" between Noble and his executive assistant, Ford,
"for the purpose of securing the acting role promised by
Harvey[.]" Am. Compl. ¶ 20. Following the "interview," Noble
sent Ford a written narrative about herself, as well as a
sampling of her acting work, which were sent to Harvey
Weinstein. Id. Having established the professional relationship,
and having received Noble's professional materials, Harvey
requested in May 2014 that she come to his hotel room at the
Cannes Film Festival to "view her reel" and "discuss further
steps regarding the [film] role." Id. at 27. In the hotel room,
Harvey's promises became more numerous. He assured Noble that
"he would arrange a meeting [] with the Tess [modeling] Agency
in London," and twice promised that "everything will be taken
care of for you if you relax." Id. at ¶ 29, 37.

What proved to be empty promises of a film role and a modeling meeting were more than enough to arouse "hope and desire" in Noble, an aspiring actress and model. See MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/entice. The allegations therefore plausibly allege the element of "enticement." 18 U.S.C. 1591. The Amended Complaint having plausibly alleged the existence of the statutory verb "entices," there is no need to analyze the others.[6]

### iii. *Knowing that means of force, threats of force, fraud, or any combination will be used*

The plain language of Section 1591(a) requires Plaintiff to plausibly allege knowledge, or a *modus operandi*, associated with above-described "enticement," that Defendant enticed Plaintiff with knowledge that means of force or fraud

---

[6]    If the statutory verb "recruits" is analyzed, it, too, appears to be plausibly alleged. See Hongxia Wang v. Enlander, No. 17-cv-4932, 2018 WL 1276854, at *6 (S.D.N.Y. Mar. 6, 2018) (defining "recruit" in the context of the labor services provision of the TVPA, Section 1590, as "persuade to do or help with something.") (citing MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/recruit and OXFORD DICTIONARIES, https://en.oxforddictionaries.com/definition/recruit)

would be used to cause a commercial sex act to take place.
United States v. Todd, 627 F.3d 329, 333-34 (9th Cir. 2010).
This requirement, while seemingly duplicative of the statute's
earlier knowledge requirement, does not impose another "layer"
of knowledge on the pleader. Rather, it requires the pleader
allege awareness, at the initial recruitment or enticement
stage, that certain prohibited means will be employed to achieve
a perverse end goal: a commercial sex act. See id. ("[W]hen an
act of Congress requires knowledge of a future action, it does
not require knowledge in the sense of certainty as to a future
act" . . . "The knowledge required [of Section 1591] is such
that if things go as he planned, force, fraud or coercion will
be used to cause his victim to engage in a commercial sex
transaction."). In other words, Defendant must have recruited or
enticed Plaintiff with the knowledge that certain statutorily-
prohibited means (discussed infra) will be used to cause
plaintiff to engage in a sex act. The Court in Todd found such
knowledge where defendant was "aware" when hiring plaintiff,
that he would use means of force to cause her to engage in a
commercial sex act.

Here, the pattern of behavior included in the Amended
Complaint plausibly alleges a knowledge and understanding that,
from the start of their professional relationship in February

21

2014, Harvey would use fraudulent means to entice Noble to engage in a sex act with him. The promise of a film role, the interview with Ford for the film role, and the assurances that "everything will be taken care of for you if you relax," including as he forced her to masturbate him, support this. Am. Compl. ¶ 37. That Harvey's promises—all professional in nature—became more frequent and elaborate once he and Noble were alone in the hotel room, and eventually the bathroom, plausibly alleges knowledge that fraud would be used.

Despite Harvey's call to a Weinstein Company producer, who promised Noble "they would work [with her]" if she "[did] whatever [Harvey] wished," his promise of a meeting with the Tess modeling agency, and his final promise to Noble as she left the room, that "his people" would "be in touch" with her, Harvey never performed on these promises, even as Noble followed up. Am. Compl. ¶ 41. These allegations go beyond mere non-performance; they evidence conscious behavior and fraudulent intent. See Powers v. British ("We find these allegations of conscious behavior, which go beyond mere non-performance, sufficient to support an inference of intent to defraud."). Harvey effectively ended his relationship with Noble the moment he ejaculated onto the hotel bathroom floor. Id. at ¶ 40-42.

These allegations, when "read as a whole," plausibly allege that Harvey was aware, when he enticed and recruited Noble throughout 2014 to work for him as an actress, that his promises had no factual basis. See Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 732 (2d Cir. 2013) ("[I]t is well-settled that a complaint must be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.") (internal quotations omitted). Harvey's failure to follow up—or to make a reasonable effort to work with Noble after May 2014, after the sex act was completed—suggests such an awareness and knowledge.

Noble also alleges that force was used, including that Harvey "forcibly pulled [Noble] into the bathroom," that he "gripped her firmly," and "pulled down [Noble's] shirt," that he "forced his leg between [Noble's] leg, [and] began rubbing her vagina" that he "forcefully grabbed [Noble's] hand, placed it on his penis, and forced her hand to masturbate him," that he "used his other hand to control [Noble] and defeat her resistance." Am. Compl. ¶ 33-37. The Amended Complaint thereby plausibly alleges the use of "means of force." Id. Plaintiff has plausibly alleged facts sufficient to satisfy this prong of the inquiry by establishing both "fraud" and "means of force." See 18 U.S.C. § 1591(a)("knowing, or in reckless disregard of the fact, that

*means of force*, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act.") (emphasis added).

iv. *To cause the person to engage in a commercial sex act*

Whether the Amended Complaint plausibly alleges a causal relationship between the promises Harvey made and the force he employed on the one hand, and the sex act's occurrence on the other, is a crucial inquiry.

While actual causation is not required to violate Section 1591,[7] because the alleged sex act in this case did in fact occur, the question is whether the prohibited means of fraud and force were "used to cause," or designed to bring

---

[7]    In <u>United States v. Alvarez</u>, the Second Circuit held that the "used to cause" language in Section 1591(a) evidences "concern[] with the means and not with the result." The court found that, because the statute employs "the future tense," "the [sex act] itself is not an element of the offense." 601 Fed.App'x 16, 18 (2d Cir. 2015). In <u>United States v. Maynes</u>, the Fourth Circuit noted, as to whether a commercial sex act need actually occur in such cases: "there is no such requirement in the statute; the crime is complete when the defendant recruits, entices, harbors, etc. the victim with knowledge that the prohibited means will be used in the future to cause them to engage in commercial sex acts." 880 F.3d 110, 114.

about, the sex act. In other words, Defendant must have intended, or been aware, that the fraud and force *would cause* a sex act to take place. See Section 1591(a).

Statements made incidental to the sex act—made for a reason other than to bring about the act—are not enough. Tied up in this inquiry is whether the statements made by Defendant were material—that is, important enough to a reasonable plaintiff to be relied upon. United States v. Maynes, 880 F.3d 110, 114 (4th Cir. 2018) ("[F]or any fraud to be relevant to the question of guilt [under Section 1591], it must have been fraud that '*would be used to cause* that person to engage in a commercial sex act.'") (emphasis added). The Amended Complaint's allegations, in total, establish material misstatements on which there was reasonable reliance.

The misrepresentations by Harvey are numerous and are fully recounted supra. Am. Compl. ¶ 16, 29, 31. Made to an aspiring actress by a film producer and co-founder of a top film studio, the statements are clearly material, and induced reasonable reliance. The statements caused Noble to first go to Harvey's hotel room, and then to partially "compl[y]" in the performance of a sex act. Id. at ¶ 28 (Noble "went to Harvey Weinstein's hotel room . . . *because of* [his] promise of the role in a TWC project[.]"); Id. at ¶ 37 ("Harvey Weinstein, once

again, told her to relax and 'everything will be taken care of for you' . . . [Noble] reasonably understood this to mean that he would follow through and assure she has the role in the promised TWC project . . . if she allowed him to complete the sex act.").

The Defendant contends that the promises made were "indefinite and vague," and thus inactionable under Section 1591. ECF No. 60 at 1-2. Reading the Amended Complaint as a whole, that Harvey did not specify the film he had "in mind" for Noble does not render her allegations implausible. Pension Ben. Guar. Corp., 712 F.3d at 732 ("[I]t is well-settled that a complaint must be read as a whole, not parsed piece by piece[.]")

It is not just what Harvey said that supports an inference of fraud. The context and history of their professional relationship imports a degree of legitimacy, of materiality, to the statements. See generally Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011) (recognizing the value of a "contextual inquiry" in determining Section 10(b) materiality).

By the time Harvey and Noble engaged in the sexual act, Harvey had twice discussed the film role with her in person, including in the telephonic presence of a TWC producer. Am. Compl. ¶¶ 16, 20, 27. Noble "interview[ed]" with, and had sent extensive professional documentation to, Harvey's Executive Assistant in London, and the documents were forwarded to Harvey. Am. Compl. ¶¶ 16, 20, 27, 31. In Cannes, the two reviewed Noble's film reel in Harvey's hotel room. Moreover, Noble and Harvey spoke with a TWC producer about future projects. Id. at ¶ 31. Harvey even requested that she "walk up and down" for "audition purposes." Id. at ¶ 29.

In this context, Harvey's statements, while less than concrete, are highly material. When they are relied upon, such reliance is reasonable. Id. ¶ 16, 20, 27, 29, 31, 37. Harvey's allegedly false statements were material and they were reasonably relied upon to Noble's detriment. Id. Taken in context, the statements cross the line "from conceivable to plausible" in alleging that fraudulent means were employed to "cause a person to engage in a commercial sex act." See Iqbal, 556 U.S. at 680; 18 U.S.C. § 1591.

*v.   Commercial sex act*

        Harvey Weinstein's principal argument against the
application of Section 1591 to these allegations is that
Plaintiff fails to allege a commercial sex act. On this
Defendant makes two points: first, that "the alleged facts do
not satisfy the 'commercial' component," and second, "the facts
alleged do not describe 'sex acts.'" Def's Br. At 12, ECF No. 60
at 10, 15. As set forth below, Plaintiff has plausibly alleged
the existence of a "commercial sex act." It is fair to say that
these allegations present an extension of an element of Section
1591 on which there is little to no prior authority. What
follows is an effort, aided by the tools of statutory
construction, to navigate these uncharted waters.


        "Commercial sex act" is defined in Section 1591(e)(3)
as "*any* sex act, on account of which *anything* of value is given
to or received by *any* person." 18 U.S.C. § 1591(e)(3) (emphasis
added). Defendant cites several authorities, including at least
three dealing almost exclusively with Commerce Clause
jurisprudence, for the proposition that a commercial sex act
must have an "economic" component and be "economic in nature."
ECF No. 60 at 12 (citing <u>United States v. Campbell</u>, 111 F. Supp
3d 340, 345 (W.D.N.Y. 2015), which concerns itself exclusively

with whether Section 1591 is "an unconstitutional exercise of Congress's power under the commerce clause"; Gonzales v. Raich, 545 U.S. 1, 23 (2005), a seminal Supreme Court case which created the interstate economic impact test to evaluate Congress's valid exercise of power; and United States v. Reed, No. 15-cr-188, 2017 WL 3208458, at *10 (D.D.C. July 27, 2017), which cites and discusses Gonzales v. Raich's interstate economic impact analysis). The economic commerce under consideration in these cases is clearly distinguishable from the instant commercial sex act analysis.

Defendant contends that the "commercial" component of "commercial sex act" is absent because "nothing of value was given to Noble." ECF No. 60 at 14. However, Congress's use of expansive language in defining commercial sex act—using such terms as "any sex act," "anything of value," "given to or received by any person"—requires a liberal reading. The concept of value offered by Plaintiff is similar in character to those considered by relevant authorities. United States v. Maneri, 353 F.3d 165, 168 (2d Cir. 2003) (defining "thing of value" in the context of 18 U.S.C. § 2252's sentencing guidelines to include intangibles, specifically "the opportunity for a sexual encounter, in return for distributing child pornography"); United States v. Cook, 782 F.3d 983, 989 (8th Cir. 2015)

29

(acknowledging the "extremely broad" nature of the term "anything of value," and holding defendant's receipt of sexual photographs, as well as the sex acts in which he participated, "could constitute things of value under [Section 1591]."); United States v. Rivera, No. 12-cr-121, 2012 WL 6589526, at *5 (M.D. Fla. Dec. 18, 2012) (finding, in the context of 1591, that "the term 'anything of value' encompasses more than just monetary gain and thus encompasses T.M.'s ordination" as a prophet.)

For an aspiring actress, meeting a world-renowned film producer carries value, in and of itself. The opportunity, moreover, for the actress to sit down with that producer in a private meeting to review her film reel and discuss a promised film role carries value that is career-making and life-changing.

The contention, therefore, that Noble was given nothing of value—that the expectation of a film role, of a modeling meeting, of "his people" being "in touch with her" had no value—does not reflect modern reality.[8]

---

[8]    The concept of the "casting couch," in which aspiring actors and actresses are promised valuable professional opportunities in exchange for sexual favors, has been in the American lexicon for nearly a century. See Ben Zimmer, 'Casting Couch': The Origins of a Pernicious Hollywood Cliché, THE ATLANTIC, Oct. 16, 2017 ("The casting couch—where, as the story goes,

Even if the prospect of a film role, of a modeling meeting, and of a continued professional relationship with TWC were not "things of value" sufficient to satisfy commercial aspect of the sex act definition, Noble's reasonable expectation of receiving those things in the future, based on Harvey's repeated representations that she would, is sufficient. See supra note 8.; see also United States v. Corley, 679 F.App'x. 1, 7 (2d Cir. 2017) (summary order) (recognizing that Section 1591 "does not require that an actual commercial sex act have occurred.").

The question then remains whether or not the alleged activity was a "sex act" covered by Section 1591. Because "any sex act" has not been defined by statute or by courts, the

---

aspiring actresses had to trade sexual favors in order to win roles—has been a familiar image in Hollywood since the advent of the studio system in the 1920s and '30s."); Laurie Johnston, Sexism in the Theater Can Be a Boon, N.Y.TIMES, Feb. 6, 1973 (recognizing the well-known Broadway "casting couch" in the 1970s); see also United States v. Condolon, 600 F.2d 7, 7 (4th Cir. 1979)(defendant posed as a talent agent and film producer, offering "legitimate and well-paid modeling and acting jobs," which were contingent upon victims' "willingness to submit to his sexual advances." In affirming wire-fraud conviction, the court noted: "fraudulent scheme need not be designed to obtain money or property" and that the loss of "time, effort, money, and expectations" were of sufficient value to represent a fraudulent exchange).

term's plain English-language meaning, along with the context in which it appears in the statute, must control.[9] See Louis Vuitton, 676 F.3d at 86 ("plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision *within the context of that statute*.") (emphasis added). Defendant urges us to ignore the expansive language used by Congress and adopt the following definitions of "sex act" from a federal sexual abuse statute, 18 U.S.C. § 2246: "[C]ontact between the penis and the vulva or the penis and the anus," "contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus," "penetration, however slight, of the anal or genital opening of another," or, "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years[.]" ECF No. 60 at 15, note 5. Because 18 U.S.C. § 2246's definition does not include the modifier "any" before "sex act," nor the Congressional intent to enhance protection for victims (see

---

9    A plain language meaning of "any sex act" is elusive in the English language. Many Americans cannot agree on the definition of "sex," let alone "any sex act." Peter M. Tiersma, Did Clinton Lie?: Defining "Sexual Relations", 79 Chi. Kent L. Rev. 927 (2004) (recognizing "widespread disagreement" in America over the precise meaning of the terms "have sex," and "sexual relationship," among others). "Sex act" is defined by Merriam Webster's Dictionary alternately as "coitus," and "an act performed with another for sexual gratification." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/sex%20act. The latter definition is certainly met here.

discussion _infra_), it is rejected as contrary to and
incompatible with Section 1591's plain language.

As the United States v. Jungers court recognized, the
use of "any" and "anything" "does not lend itself to restrictive
interpretation." 702 F.3d at 1070. Nor could it. See Williams v.
Taylor, 529 U.S. 362, 364 (2000) ("In light of the _cardinal
principle_ of statutory construction that courts must give
effect, if possible, to every clause and word of a statute.")
(emphasis added); Ali v. Fed. Bureau of Prisons, 552 U.S. 214,
220 (2008) ("read naturally, the word 'any' has an expansive
meaning, that is, 'one or some indiscriminately of _whatever
kind_.'") (emphasis added) (quoting Webster's Third New
International Dictionary 97 (1976)). The Supreme Court in Ali v.
Fed. Bureau of Prisons held that Congress's decision to include
the word "any" within the statutory phrase "any other law
enforcement officer" modified and expanded the phrase to mean
"law enforcement officers of _whatever kind_." 552 U.S. at 220
(emphasis added).

As such, Congress's decision to use the modifier "any"
within the phrase "any sex act" in Section 1591(e)(3) suggests
an intent to expand "sex act" beyond a limited set of activities

that involve contact between, or penetration by, two sets of genitalia. 18 U.S.C. § 1591(e)(3).

The plain meaning of "any sex act," interpreted in the broader statutory context of Sections 1591 and 1595—considering Congress's stated intent of "enhancing . . . protections of trafficking victims"—brings Harvey's conduct within the ambit of Section 1591. Section 1595, Pub. L. 108-193, Dec. 19, 2003, 117 Stat. 2878, §4 (effective Dec. 19, 2003). By forcibly "rubbing her vagina," and forcing Noble to, among other things,[10] "masturbate him" to ejaculation, Harvey's conduct meets the statutory definition of "any sex act" from Section 1591(e)(3). Am. Compl. ¶ 36-37; See supra note 6 ("Sex act is defined by Merriam Webster's Dictionary alternately as 'coitus,' and 'an act performed with another for sexual gratification.'"). And because the "commercial" component has been established above, the act was a "commercial sex act" under Section 1591.

Harvey Weinstein cautions the Court against application of Section 1591 to conduct involving "consensual

---

[10]    More fully, the Amended Complaint alleges that Harvey "pulled down [Noble's] shirt, revealing her breasts," that he "groped her breasts," that he "forced his leg between [Noble's] legs, began rubbing her vagina, and then took his penis out and began masturbating," and that he "forcefully grabbed [Noble's] hand, placed it on his penis, and forced her hand to masturbate him." Am. Compl. ¶ 32, 35, 36, 37.

sexual activity," and other ordinary sexual encounters. ECF No. 60 at 13. He poses to the Court a hypothetical: "Query whether an individual who treats a person to a free dinner and a movie, promises future outings and/or gifts, and then attempts and/or engages in what he or she construes as consensual sexual activity, could be prosecuted under Section 1591 as a 'sex trafficker.'" Id. Notably absent from this hypothetical are the necessary elements of force, fraud, and commerce, all of which have been established here. See discussion supra.

Accordingly, Plaintiff has plausibly alleged that Harvey Weinstein, knowingly and in interstate commerce, enticed and or recruited her knowing that means of force, fraud, or a combination of the two, would be employed to cause her to engage in a commercial sex act.

## V.    Robert Weinstein's Motion to Dismiss Counts III and V is Granted

### Count III: Participation in a Sex Trafficking Venture

The first claim against Robert is that he benefited from, and knowingly facilitated, Harvey's violation of Section

1591(a), and thus violated Section 1591(a)(2). Am. Compl. at ¶¶

74, 77. Section 1591(a)(2) reads:

> Whoever knowingly —
>
> . . . .
>
>> (2) benefits, financially or by receiving
>> anything of value, from participation in a venture
>> which has engaged in an act described in violation of
>> paragraph (1)
>
>> Knowing, or in reckless disregard of the
>> fact, that means of force, threats of force, fraud,
>> coercion described in subsection (e)(2), or any
>> combination of such means will be used to cause the
>> person to engage in a commercial sex act [is liable.]

18 U.S.C. 1591(a)(2).

As relevant to the instant claim, Plaintiff alleges

that Robert "factilitat[ed] Harvey Weinstein's commercial sex

acts in foreign commerce," that he "enjoyed the promotion and

promulgation of TWC projects internationally," that he

"continued to pay for and facilitate these foreign trips for

Harvey Weinstein," and that he "knowingly benefitted financially

from the venture of Harvey Weinstein."[11] Am. Compl. at ¶¶ 72, 73,

76, 77.

---

[11]   By reference to the OAG Complaint, Plaintiff alleges that
Robert "used settlement agreements that contained strict NDAs"
to silence victims of Harvey's behavior. Am. Compl., Exh. A ¶ 8.
Importantly, though, these allegations do not relate to
Plaintiff, nor to Harvey's 2014 conduct in Cannes. See supra
note 3.

To adequately allege "participation in a venture in violation of 18 U.S.C. § 1591(a)(2)," Plaintiff must plead facts suggesting that Robert (i) "knowingly benefitted, (ii) from participation in a commercial sex trafficking venture, (iii) while knowing (or in reckless disregard of the fact) that means of force, fraud or coercion would be used to cause the trafficked person to engage in a commercial sex act." United States v. Alfyare, 632 F. App'x 272, 283 (6th Cir. 2016). "Venture" is defined in Section 1591(e) as "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(5).

Because guilt, or in this case liability, cannot be established by association alone, Plaintiff must allege specific conduct that furthered the sex trafficking venture. Such conduct must have been undertaken with the knowledge, or in reckless disregard of the fact, that it was furthering the alleged sex trafficking venture. In other words, some participation in the sex trafficking act itself must be shown. Id. at 285 ("[D]efendant's mere *membership* in the venture is insufficient if he is ignorant of the venture's sex trafficking activities (and the means and methods thereof).") (emphasis added). Here, factual allegations implicating Robert as a participant in Harvey's 2014 conduct toward Noble are required. Without

participation, there can be no violation of Section 1591(a)(2).
United States v. Alfyare, 632 F. App'x at 286 ("We agree with
the district court and find that § 1591(a)(2) targets those who
*participate in sex trafficking*; it does not target [those] who
turn a blind eye to the source of their financial sponsorship.")
(emphasis added).

Plaintiff makes several conclusory allegations about
Robert's involvement in Harvey's conduct. The Amended Complaint
alleges that Robert "facilitated" and "pa[id] for" Harvey's
travel in interstate commerce, that he "knowingly benefited
from" Harvey's violation of Section 1591, and that he "paid for
prior settlements of claims made by women against [Harvey]." Am.
Compl. ¶¶ 72, 73, 76, Am. Compl., Exh. A at ¶ 98.

But in order to plead a violation of Section
1591(a)(2) against Robert, Plaintiff must have supplied "factual
content that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged." Iqbal,
556 U.S. at 663 (quoting Twombly, 550 U.S. at 556). What is
required here, and what is missing, are factual allegations of
participation that render a violation of Section 1591(a)(2) by
Robert plausible on its face.

38

Taken as true, the allegations against him suggest that Robert "facilitated" Harvey's travel by virtue of his job responsibilities at TWC, and that he "benefitted financially from Harvey Weinstein's promotion of films and other business-related activities in foreign commerce." Am. Compl. ¶ 9. What is missing are factual allegations that link Robert's actions to Harvey's 2014 conduct toward Noble. See Lawson v. Rubin, 17-cv-6404, 2018 WL 2012869, at *11 (E.D.N.Y. Apr. 29, 2018) (dismissing claims against peripheral defendant, because plaintiffs failed to "allege any facts to show that [defendant] knowingly benefitted . . . from participation in a venture.") (internal quotations omitted). In Lawson, our sister court rejected a "participation in a venture" claim, because:

> The amended complaint, like the original complaint, does not allege that [defendant] was present for any of the alleged assaults, was told about them before or after they occurred . . . nor does it allege anything similar, which might show knowledge or reckless disregard.

Lawson, 2018 WL 2012869, at *11.

So too here. The Amended Complaint does not contain any specific factual allegations that plausibly allege Robert knew of, or participated in, Harvey's alleged violation of Section 1591 in Cannes.

Plaintiff claims that it can be "reasonably inferred that Robert Weinstein knew of Harvey's scheme in violation of 18 U.S.C. § 1591(a), or at least recklessly disregarded the pertinent facts." Pl.'s Br. At 11, ECF No. 80. However, there are insufficient facts in her Amended Complaint to suggest this. Count III against Robert for "participating in a venture in violation of 18 U.S.C. § 1591" is therefore dismissed.

### Count V: Aiding and Abetting a Section 1591 Violation

Finally, Plaintiff alleges that Robert violated Section 1591 by "aiding and abetting" Harvey's violation of Section 1591. To be clear, aiding and abetting liability is not provided for in Section 1595. And "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, *there is no general presumption that the plaintiff may also sue aiders and abettors*." Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 183 (1994).

While Central Bank involved Section 10(b) of the 1934 Securities Act, which contains an implied, rather than express, private right of action, its holding has been extended to

40

statutes, like Section 1591, with *express* private rights of
action. Jean-Charles v. Perlitz, F. Supp. 2d 276, 287 (D. Conn.
2013)("Plaintiffs claim that [secondary defendants] can be held
liable under Section 1595 because they aided and abetted
[primary defendant] . . . However, the text of the statute does
not support such a reading and thus the argument fails under
Central Bank."); Gill v. Arab Bank, PLC, 893 F.Supp. 2d 474,
497-502 (E.D.N.Y. 2012) ("But the fact that Central Bank dealt
with an implied private right of action is irrelevant. Central
Bank's analysis did not distinguish between express rights of
action and those that are implied.").

      The Supreme Court's holding in Central Bank, coupled
with the absence of authorities supporting aider and abettor
liability under Section 1595, militates against reading a form
of liability into a statute that does not provide for it. See 18
U.S.C. § 1591, 1595.

      Even if the Court were to find aiding and abetting
liability available under Section 1595, Plaintiff's allegations
against Robert fall short. To plead secondary civil liability on
a theory of aiding and abetting, plaintiff must sufficiently
plead: (i) a primary violation of the statute by the primary
defendant, (ii) knowledge by the secondary defendant of his role
in the illegal conduct; and (iii) "substantial assistance" by

the secondary defendant in the primary violation. See generally Line v. Arab Bank, PLC, 882 F.3d 314, 329 (2d Cir. 2018). The focus of aiding and abetting, in the context of civil liability, is "whether a defendant knowingly gave 'substantial assistance'" to the primary violator of the underlying statute. See Halberstam v. Welch, 705 F.2d 472, 478 (D.C. Cir. 1983).

Plaintiff cites Taggart v. United States, a Tenth Circuit case from 1933 which affirmed the wire fraud conviction of an aider and abettor who "controlled and directed" the company from which the fraud was perpetrated. 63 F.2d 285, 287 (10th Cir. 1933). According to Plaintiff, Taggart supports her contention, that partial ownership and control of the Weinstein Company by Robert gives rise to an "inference" of aiding and abetting Harvey's violations. Pl. Opp. at 15, ECF No. 80. But the defendant in Taggart did more than just own and control the fraudulent company: he "assisted in the preparation of a circular letter" that was fraudulent, he "knew this letter of circular was prepared for distribution through the United States mails," and he "knew the [Company] could not meet the obligations of its contracts." Id. Here, no such connection to, or assistance with, the underlying violation of Section 1591 is alleged by Plaintiff.

Even if Plaintiff satisfied the first two elements of aider and abettor liability by pleading specific knowledge of Harvey's conduct in Cannes—and the Amended Complaint provides no such allegations—Plaintiff has not alleged "substantial assistance" by Robert in the commission of the primary violation. Oblique references to "joint business interests" and Robert's "support[] of Harvey Weinstein" as co-founder of TWC do not suffice. For these reasons, Count V of the Amended Complaint, alleging an "aiding and abetting" violation of Section 1591 against Robert, is dismissed.

## VI.   Conclusion

Based on the conclusions set forth above, Defendant Harvey Weinstein's motion to dismiss the Amended Complaint is denied, and Defendant Robert Weinstein's motion to dismiss the Amended Complaint is granted.

The parties are directed to meet and confer on a pretrial conference, discovery, and trial.

It is so ordered.

New York, NY
August /3 , 2018

_____

ROBERT W. SWEET
U.S.D.J.

44